**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

STANDARD INSURANCE COMPANY,

      Plaintiff,

      v.

YATHOMAS LEE RILEY; JOSEPH
AMODIO, as Guardian of minor G.W.R.; and
EILEEN AMODIO, as Guardian of minor
G.W.R.,

      Defendants.

CIVIL ACTION NO. 6:19-cv-84

## O R D E R

This interpleader action concerns the proper disposition of insurance proceeds from a life insurance policy on the life of Lisa Riley. (Doc. 1.) Presently before the Court are Defendants Joseph Amodio and Eileen Amodio's Motion for Summary Judgment, (doc. 74), and Motion for Hearing, (doc. 76), requesting the disbursement of the insurance proceeds from the Court's registry to minor G.W.R., (doc. 74). Defendant Yathomas Riley filed a Response, (doc. 79), and Defendants Joseph and Eileen Amodio filed a Reply, (doc. 87). For the reasons set forth below, the Court **DENIES** Defendant Joseph and Eileen Amodio's Motion for Summary Judgment.[1] (Doc. 74.)

---

[1] The Amodios request that the Court grant oral argument on their Motion for Summary Judgment "[d]ue to the magnitude of evidence establishing Defendant Riley's guilt for the murder of Lisa Riley." (Doc. 76, p. 1.) Having considered the parties' fully briefed submissions on the Amodios' Motion for Summary Judgment, the Court finds there is no need for a hearing. Accordingly, the Court **DENIES** the Amodios' Motion for Hearing. (Doc. 76.)

**BACKGROUND**

I.     **Procedural History**

Plaintiff Standard Insurance Company (the "Insurer") issued a life insurance policy (the "Policy") on the life of Lisa Riley with Defendant Yathomas Riley as the designated beneficiary. (Doc. 78, pp. 1–2.)  Lisa Riley was Defendant Yathomas Riley's wife and Defendants Joseph and Eileen Amodio's daughter.  (Id.)  Minor G.W.R. is the natural child of Lisa Riley and Defendant Yathomas Riley.  (Id. at p. 2.)  On July 9, 2015, a jury in the Superior Court of Lee County convicted Defendant Yathomas Riley for the murder of Lisa Riley.  (Id. at p. 2.)  Defendant Riley subsequently filed a motion for new trial, which remains pending in state court.  (Doc. 74-1, p. 18 ("Defendant Riley's conviction has not yet been upheld on appeal . . . ."); doc. 79, p. 2 ("[Defendant] Riley—arguing ineffective assistance of counsel and other procedural due process issues—filed a Motion for New Trial, which is currently pending before the Lee County, Georgia[,] court.").)

The Insurer initiated this suit on September 16, 2019, seeking to deposit the funds owed under the Policy (plus accrued interest) (the "Funds") and to obtain an order relieving it from any further liability under the Policy.  (Doc. 1.)  The Court granted the Insurer's Motion to Deposit Funds, (docs. 4, 29), and the Insurer subsequently deposited the Funds into the Court's registry, (doc. 31).  The Court then dismissed the Insurer with prejudice from this action, relieving it from all further liability under the Policy and permanently enjoining Defendants from bringing any other action against it for recovery of benefits under the Policy.  (Doc. 43.)  Thus, Defendant Riley and the Amodios remain to litigate their claims for the Funds amongst themselves.

Defendants Joseph and Eileen Amodio, the guardians of G.W.R., filed the at-issue Motion for Summary Judgment, requesting disbursement of the Funds to G.W.R.  (Docs. 74, 74-1.)  The

Amodios argue that they are entitled to summary judgment and disbursement of the Funds because Defendant Riley is barred from receiving the Funds under Georgia's slayer statute, O.C.G.A. § 33-25-13,[2] meaning G.W.R. should receive the Funds as Lisa Riley's heir or the Policy's secondary beneficiary.  (See doc. 74-1.)  Defendant Riley generally argues that the Amodios are not entitled to summary judgment because a question of material fact exists as to whether he killed Lisa Riley.  (See doc. 79.)

II.      **Factual Background**

      A.      **Evidence from Criminal Trial**

      Most of the following facts come from a complete and certified copy of the trial transcript and exhibits[3] from Defendant Riley's criminal trial in state court.[4]  (See doc. 74-2.)  Defendant Riley and Lisa Riley were married and lived together in their home in Leesburg, Georgia, with

---

[2]  As discussed in Discussion Section I, infra, O.C.G.A. § 33-25-13: (1) prohibits a policy beneficiary from claiming life insurance proceeds if he or she murdered the insured and (2) entitles either the deceased's heirs or the policy's secondary beneficiaries to the proceeds.  See O.C.G.A. § 33-25-13.

[3]  The Amodios manually filed the certified trial transcript and exhibits with the Court.  (See doc. 74-2.) The Court cites to the volume and page number of the trial transcript under the following citation: "Trial Tr. Vol. X, p. X."  The Court cites to the trial exhibits as "Trial Ex. X."

[4]  The Court notes that parties may rely on certified trial transcripts and exhibits from related criminal proceedings in support of a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. See Fuqua v. Turner, 996 F.3d 1140, 1148 (11th Cir. 2021) ("We regard testimony in a judicial proceeding as functionally equivalent to deposition testimony since it is given under oath and with the opportunity for cross-examination.  Accordingly, we hold that such testimony can be considered on a motion for summary judgment."); United States v. O'Connell, 890 F.2d 563, 567 (1st Cir. 1989) ("'[T]here is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding.' . . . We conclude that the district court properly considered the . . . trial testimony excerpts in determining that there were no genuine issues of material fact . . . .") (quoting Adv. Fin. Corp. v. Isla Rica Sales, Inc., 747 F.2d 21, 27 (1st Cir. 1984)); Williams v. Vasquez, 62 F. App'x 686, 692 (7th Cir. 2003) (finding that the district court properly considered the transcript from a prior criminal proceeding under Rule 56(c) in deciding a motion for summary judgment); Beiswenger Enters. Corp. v. Carletta, 46 F. Supp. 2d 1297, 1299 (M.D. Fla. 1999) ("Respondents/Claimants rely on testimony taken in the state court proceeding to support their motion for summary judgment.  Trial testimony, even when from a proceeding in which the parties, subject matter, and counsel are not the same, can be used because it is sworn testimony which is at least as reliable as that found in affidavits.") (citing Langston v. Johnson, 478 F.2d 915, 917 n.17 (D.C. Cir. 1973)).

their child, G.W.R.  (See doc. 73, p. 8; doc. 78, pp. 2, 6.)  The Rileys' home had an ADT home security system in place that included four surveillance cameras, master bedroom and front hallway motion sensors, glass-break detectors, a front door sensor, and smart phone remote access. (Doc. 78, p. 6.)  Only one of the surveillance cameras captured footage from inside the Rileys' home ("Camera Three").[5]  (See Trial Ex. S-7; Trial Tr. Vol. 5, pp. 829–830.)  Camera Three was located just inside the front door.  (See Trial Ex. S-7; Trial Ex. S-34; see also Trial Tr. Vol. 5, p. 840.)  The right portion of Camera Three's view depicts the home's living room, and the left portion of Camera Three's view depicts a hallway leading to all of the bedrooms.  (See Trial Ex. S-7; Trial Ex. S-34; see also Trial Tr. Vol. 5, p. 840.)  Notably, Camera Three does not show the interior of the back bedroom where Lisa Riley's body was found (the "Back Bedroom") or the entrance to the Back Bedroom.  (See Trial Ex. S-7; Trial Ex. S-31.)

On July 9, 2015, at approximately 8:14 p.m., Camera Three depicts Lisa Riley walking down the hallway toward the bedrooms with G.W.R, with Defendant Riley then following behind them.[6]  (See Trial Ex. S-7.)  At approximately 8:15 p.m., Lisa Riley is seen turning and walking with G.W.R. down a connecting hallway toward the Back Bedroom (out of Camera Three's view). (See Trial Ex. S-7; Trial Tr. Vol 5, pp. 843–44; see also doc. 78, p. 7.)  This is the last time that Lisa Riley is seen on any of the home's surveillance cameras.  (See Trial Ex. S-7; see also Trial Tr. Vol. 5, p. 844; see also doc. 78, p. 7.)  At approximately 8:16 p.m., Defendant Riley follows behind them.  (See Trial Ex. S-7; see also doc. 78, p. 8.)  Defendant Riley does not appear again

---

[5]  The other three surveillance videos depicted the front yard and driveway ("Camera One"), the front stoop ("Camera Two"), and what appears to be the backyard.  (See Trial Ex. S-7; Trial Ex. S-34.)

[6]  The time stamps on the surveillance video footage are in military time and are approximately three minutes faster than actual time.  (Doc. 78, p. 7; see also Trial Ex. S-7.)  Any times listed in this Order are the actual times.

on any of the surveillance videos until approximately 8:27 p.m.  (See Trial Ex. S-7; see also doc. 78, p. 8.)

At 8:23 and 8:26 p.m., the glass-break detectors in the Back Bedroom activated.  (Trial Ex. S-32, p. 71; Trial Tr. Vol. 9, pp. 1572–74; see also doc. 78, p. 8.)  Glass-break detectors listen for loud sounds within twenty-five feet of the detectors and trigger when they hear the sound.  (Trial Tr. Vol. 9, p. 1549; see also doc. 78, p. 9.)  Gunshots from a handgun can set off glass-break detectors.  (Trial Tr. Vol. 9, pp. 1568–69; see also doc. 78, p. 9.)  While nothing in the record indicates that any broken glass was found at the Rileys' home, (see doc. 78, p. 10), law enforcement's investigation revealed that a gunshot in the Back Bedroom could have activated the Back Bedroom's glass-break detectors.  (Trial Tr. Vol. 9, pp. 1644–45; see also doc. 78, p. 9.)

At approximately 8:27 p.m., Camera Three depicts Defendant Riley walking out of the area of the Back Bedroom toward the living room while carrying G.W.R.  (See Trial Ex. S-7; see also doc. 78, p. 11.)  At approximately 8:28 p.m., Camera Three shows Defendant Riley walking back down the hallway towards the bedrooms without G.W.R.  (See Trial Ex. S-7; see also doc. 78, p. 12.)  At approximately 8:29 p.m., Defendant Riley walks back down the hallway towards the living room and then returns on camera with G.W.R.  (See Trial Ex. S-7; see also doc. 78, p. 12.)  Defendant Riley carries G.W.R. down the hallway, then returns into Camera Three's view without G.W.R., and then leaves the house through the front door at 8:32 p.m.  (See Trial Ex. S-7; see also doc. 78, pp. 12–13.)  Camera One depicts Defendant Riley getting into a vehicle and leaving the residence at approximately 8:32 p.m.  (See Trial Ex. S-7.)

Defendant Riley remained out of the home for approximately twelve hours.  (Doc. 78, p. 14.)  While Defendant Riley was away, none of the home's motion sensors or door sensors activated, and neither Lisa Riley nor G.W.R. appeared in the footage from any of the home's

5

cameras.  (Id. at p. 15.)  Defendant Riley's cell phone tracking data shows that Defendant Riley

drove to Albany, Georgia, arriving at 10:32 p.m.  (Id. at p. 17.)  Between 9:51 p.m. on July 9, 2015,

and 7:36 a.m. on July 10, 2015, ADT's logs for the Riley home indicate that Defendant Riley

remotely connected to his home's security system forty-two times from his smart phone, giving

him access to the security system and livestreaming of his home's security cameras.  (Id.)  On July

10, 2015, at approximately 8:22 a.m., Cameras One and Two depict Defendant Riley pulling into

his driveway and entering his home.  (See Trial Ex. S-7; see also doc. 78, p. 19.)  Camera Three

then shows Defendant Riley walking down the hallway toward the Back Bedroom.  (See Trial Ex.

S-7; see also doc. 78, p. 20.)  At approximately 8:31 a.m., Defendant Riley called 911.  (Doc. 78,

p. 21.)  First responders subsequently arrived and found Lisa Riley dead in the Back Bedroom.

(Id. at p. 8.)

Georgia Bureau of Investigation medical examiner Dr. Melissa Sims-Stanley performed an

autopsy of Lisa Riley's body.  (Trial Tr. Vol. 7, pp. 1225–26.)  The autopsy revealed that Lisa

Riley suffered an entrance gunshot wound to her "lateral right forehead, right front scalp."  (Id. at

p. 1226.)  The autopsy further revealed an exit gunshot wound "behind and below the left ear, right

below the base of the left skull."  (Id. at pp. 1226–27.)  Furthermore, Dr. Sims-Stanley testified

that the "muzzle-to-victim distance" (i.e., the distance between the gun and Lisa Riley's head) was

"between one to two inches."  (Id. at p. 1234.)  Based on her examination, Dr. Sims-Stanley

concluded "to a reasonable degree of medical and scientific certainty," that the manner of Lisa

Riley's death was "best classified as homicide."[7]  (Id. at p. 1239.)  In reaching this conclusion, Dr.

Sims-Stanley noted several characteristics about the gunshot wound "that suggested that [Lisa

Riley's cause of death] was not likely . . . suicide."  (Id. at p. 1230.)  Dr. Sims-Stanley noted that

---

[7] "For the purposes of a medical examiner, homicide . . . mean[s] when the actions of another individual
cause or contribute to the death."  (Trial Tr. Vol. 7, pp. 1248–49.)

Lisa Riley's gunshot wound "had a steep[] downward trajectory" and was a "non-contact" wound, meaning that the gun was not touching Lisa Riley's skin. (Id.)  According to Dr. Sims-Stanley, the "most common trajectory for suicide gunshot wounds" is "essentially . . . from side-to-side," and ninety-seven to ninety-eight percent of suicide gunshot wounds to the head were "contact gunshot wounds" with the other two to three percent being non-contact gunshot wounds. (Id. at pp. 1228–29, 1244.)

### B.      The Amodios' Requests for Admission

The Amodios argue that certain facts contained in the Requests for Admission that they served on Defendant Riley should be deemed admitted because he failed to timely respond. (Doc. 74-1, pp. 10–11.)  Federal Rule of Civil Procedure 36(a) permits a party to "serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to:" (1) "facts, the application of law to fact, or opinions about either;" and (2) "the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1).  "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3).  Furthermore, "[a] matter admitted under [Rule 36] is *conclusively established* unless the court, *on motion*, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b) (emphasis added).  "The purpose of the rule is to expedite the trial and to relieve the parties of the cost of proving facts that will not be disputed at trial." Perez v. Miami-Dade County, 297 F.3d 1255, 1264 (11th Cir. 2002) (quotation and citation omitted).

Here, the Amodios served Defendant Riley with Requests for Admission on March 19, 2020, (doc. 74-8), but Defendant Riley did not timely respond, (doc. 98, pp. 5–6).  Thus, according to the Amodios, the Court should deem the matters contained in the Requests for Admission

admitted.  (Doc. 74-1, pp. 10–11.)  Defendant Riley did file a Motion to Withdraw, (doc. 80), but it was denied by the Magistrate Judge because Defendant Riley failed to "comply with the discovery dispute procedures mandated by" the Court's Rule 26 Instruction Order, (doc. 98, p. 7). Defendant Riley also argued in his Response to the Amodios' Motion for Summary Judgment that the Court should not deem the statements contained in the Requests for Admission as admitted. (Doc. 79, pp. 10–11, 11 n.2.)  Ordinarily, the Court would not revisit a party's request that the statements not be deemed admitted, even when the prior denial of the request was based on the failure to comply with a Court directive.  However, on the unique facts of this case, particularly given the impact the admissions would have on the case, and given the fact that courts frequently permit the withdrawal of admissions even in the absence of *any* formal request, the Court finds it prudent to analyze whether withdrawal is warranted, rather than to refuse to consider the request based solely on a technical procedural error.  See Essex Builders Grp., Inc. v. Amerisure Ins. Co., 230 F.R.D. 682, 686 (M.D. Fla. 2005) ("Although Travelers has not filed a formal motion to withdraw its admission, it opposes OneBeacon's motion on the grounds that OneBeacon would suffer no prejudice by having the admissions withdrawn, that OneBeacon's position does not further the interests of justice and that the requests for admission were improper.  The Court construes Travelers' opposition to the motion to deem its responses as being admitted as fulfilling Rule 36(b)'s requirement that the relief be sought on motion.") (citing Bergemann v. United States, 820 F.2d 1117, 1121 (10th Cir. 1987)); see Bergemann, 820 F.2d at 1121 (construing an opposition to a motion for summary judgment as a motion to withdraw admissions); Motown Record Co., L.P. v. Liggins, No. 2:05-cv-273-MEF, 2006 WL 3257792, at *2 (M.D. Ala. Nov. 9, 2006) (construing response to a motion for summary judgment as a motion to amend deemed admissions); Riquelme v. United States, No. 8:07-cv-2180-T-30MAP, 2009 WL 1405179, at *2

8

(M.D. Fla. May 19, 2009) (same); <u>Johnson v. Logan's Roadhouse, Inc.</u>, No. 4:12-CV-0084-HLM,

2012 WL 12884667, at \*2 (N.D. Ga. Oct. 3, 2012) (same).

"[D]istrict courts should apply a 'two-part test' in deciding whether to grant or deny a

motion to withdraw or amend admissions." <u>Perez</u>, 297 F.3d at 1263–64. "First, the court should

consider whether the withdrawal will subserve the presentation of the merits, and second, it must

determine whether the withdrawal will prejudice the party who obtained the admissions in its

presentation of the case." <u>Id.</u> at 1264. The first part of the test "emphasizes the importance of

having the action resolved on the merits" and is "satisfied when upholding the admissions would

practically eliminate any presentation of the merits of the case." <u>Id.</u> at 1266 (quotation and citation

omitted). Here, the Amodios ask the Court to deem as admitted, among other things, that

Defendant Riley was "holding a gun when it fired and one or more bullets struck Lisa Riley," that

"Lisa Riley did not shoot herself on July 9 or July 10, 2015," and that Defendant Riley, "[o]n at

least on[e] occasion, . . . told Lisa Riley that [he was] going to kill her." (Doc. 74-1, pp. 10–11.)

These facts, among others that the Amodios argue should be deemed as admitted under Rule 36,

would essentially admit "the necessary elements" of Georgia's slayer statute. <u>See</u> Discussion

Sections I & II, <u>infra</u>. Indeed, these facts, if deemed admitted, would "conclusively establish" that

Defendant Riley shot and killed Lisa Riley. <u>See, e.g.</u>, <u>Perez</u>, 297 F.3d at 1266 ("In the instant case,

the items the court had deemed admitted conclusively established the liability of both defendants

under 42 U.S.C. § 1983. For instance, the court found that the County had admitted that it had 'a

practice, policy, or custom of allowing police officers to use unnecessary and unreasonable deadly

force, including the use of motor vehicles to strike and detain subjects.' A municipality's practice,

policy, or custom is not some tangential factual matter in a section 1983 case; it is the core element

and is, consequently, often the most disputed. Deeming this element admitted took the wind out

of the defendants' sails and effectively ended the litigation."); Hadley v. United States, 45 F.3d 1345, 1348 (9th Cir. 1995) (finding withdrawal appropriate where two of the admissions "essentially admitted the necessary elements [of the claims]").  Thus, the Court finds that the first prong of the two-part test is "easily met." Perez, 297 F.3d at 1266; see, e.g., Burch v. P. J. Cheese, Inc., No. 2:09-cv-1640-SLB, 2011 WL 13233278, at *3 (N.D. Ala. Aug. 17, 2011) ("Plaintiff's requests for admission . . . ask defendant to admit several essential elements of plaintiff's claims . . . .  Therefore, the court finds that the first part of the test is satisfied."); Johnson v. Logan's Roadhouse, Inc., 2012 WL 12884667, at *3 ("[I]f the Court concludes that Plaintiffs have admitted all of the topics in the Request, then, as a practical matter, Plaintiffs cannot prove the elements of their claims.  The Court consequently finds that the first prong of the Rule 36(b) test is satisfied.").

The second question "requires the court to ascertain whether the non-moving party would be prejudiced by a withdrawal or amendment of admissions."  Perez, 297 F.3d at 1266.  "The prejudice contemplated by [Rule 36] is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth."  Id.  "Rather, it relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions."  Id.  "[A] court is more likely to find prejudice when a party seeks to withdraw its admissions once trial has already begun."  Id. at 1267.  Here, the Amodios would suffer little, if any, prejudice if the Court permits Defendant Riley to withdraw his admissions.  First, trial has not begun for this case, nor has a trial date been set.  Furthermore, the Amodios knew from the beginning of this case that Defendant Riley maintained his innocence in Lisa Riley's killing.  Indeed, Defendant Riley maintained his innocence throughout his criminal trial, Defendant Riley's motion for new trial is pending in state court, and Defendant Riley filed two motions to stay

10

proceedings pending his motion for new trial in state court in which he raised his concerns about the Fifth Amendment and responding to the Amodios' Requests for Admission.  (See doc. 39, p. 3; doc. 40, pp. 5–6; doc. 59, p. 3.)  Thus, the Amodios "knew from the very beginning" that they would have to prove the elements of the Slayer Statute to obtain relief.  Perez, 297 F.3d at 1267. Thus, the Court finds that the second part of the two-part test is satisfied.  See, e.g., id. at 1267–68 ("Because Perez knew from the very beginning—and continued to be made aware—that he would have to prove many of the elements of his case now deemed admitted, he would have suffered no prejudice had the court allowed a withdrawal.  In fact, Perez had been engaging in discovery all along, albeit with some resistance by the County, and had only relied on the admissions for six days . . . ."); Ndalamba v. Trice, No. 6:20-cv-1210-GAP-GJK, 2021 WL 6125525, at *4 (M.D. Fla. Oct. 7, 2021) ("Trial is scheduled in this case for January 2022.  [Defendant] does not argue that evidence that existed at the time the responses to the Requests were due no longer exists.  She does not argue that before [Plaintiffs] failed to respond to the Requests that she did not know of any evidence supporting [Plaintiffs'] case or that she would have to prove the elements of her defamation and trade libel claims.  [Defendant] is also not precluded from moving to extend the discovery deadline based on [Plaintiffs'] September 2, 2021[,] response[s] to the Requests.  The Court is not persuaded that [Defendant] will suffer prejudice if [Plaintiffs] are permitted to amend their admissions . . . ."); Reid v. McNeil, No. 3:09-cv-1283-J-34MCR, 2015 WL 5755898, at *6 (M.D. Fla. Sept. 29, 2015) (finding no prejudice for purposes of the second prong because the withdrawal of admissions did not create any additional difficulty for plaintiff to prove his case, and plaintiff knew throughout the entirety of the litigation that defendants disputed the substantive factual allegations contained in the requests for admissions).  Based on the foregoing, the Court

permits Defendant Riley to withdraw his admissions.  Accordingly, the Court does not deem the admissions in the Amodios' Requests for Admission as true.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346,

1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir.

2007)). However, "facts must be viewed in the light most favorable to the non-moving party only

if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he

mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Id. (emphasis omitted) (quoting Anderson, 477 U.S. at 242, 247–248).

**DISCUSSION**

**I.      Georgia's Slayer Statute**

The Amodios argue that they are entitled to summary judgment because O.C.G.A. § 33-

25-13 bars Defendant Riley from receiving any portion of the Funds, and G.W.R is entitled to the

Funds because G.W.R. is the heir of Lisa Riley. (Doc. 74-1, pp. 2, 17–22.) Under O.C.G.A. § 33-

25-13 (the "Slayer Statute"),

> [n]o person who commits murder or voluntary manslaughter . . . shall receive any
> benefits from any insurance policy on the life of the deceased, even though the
> person so killing . . . be named beneficiary in the insurance policy. A plea of guilty
> or a judicial finding of guilt not reversed or otherwise set aside as to any of such
> crimes shall be prima-facie evidence of guilt in determining rights under this Code
> section.

O.C.G.A. § 33-25-13. Under this statute, criminal convictions for murder or voluntary

manslaughter of the insured may serve as prima facie evidence of guilt if the defendant has

exhausted his right to a direct appeal or the time to file a direct appeal has expired. See Slakman

v. Cont'l Cas. Co., 587 S.E.2d 24, 27 (Ga. 2003) ("[U]nder O.C.G.A. § 33-25-13[,] an individual's

conviction in a criminal prosecution for the murder or voluntary manslaughter of the insured may

serve as prima facie evidence of guilt in a civil proceeding brought pursuant to O.C.G.A. § 33-25-

13 upon either the exhaustion of the individual's right to a direct appeal or the expiration of time

within which a first direct appeal could have been timely filed."). "A criminal conviction,

however, is not always necessary to bar recovery" of insurance proceeds.  Globe Life & Accident

Ins. Co. v. Chisholm, No. 4:19-cv-158, 2021 WL 5912013, at *3 (S.D. Ga. Dec. 14, 2021).  Indeed,

even if a defendant is not criminally responsible for the death of the insured, the defendant may

still be barred from receiving benefits from an insurance policy "if it is determined under the

appropriate standard of proof that the individual committed murder or voluntary manslaughter."

Id.; see also Metro. Life Ins. Co. v. Landers, No. 1:14-CV-02912-MHS, 2015 WL 12857083, at

*1 (N.D. Ga. Apr. 23, 2015) ("[E]ven if [the defendant's] conviction w[as] reversed on appeal and

he w[as] subsequently acquitted, he could still be found responsible for the homicide in a civil

proceeding . . . and disqualified from receiving the Plan Benefits.").  The appropriate standard of

proof in civil cases such as this case is a "preponderance of the evidence."  See Cont'l Cas. Co. v.

Adamo, 286 F. App'x 625, 627 (11th Cir. 2008) ("A preponderance of the evidence is sufficient

to support a verdict in a civil case."); Johnson v. Smith, No. 1:11-cv-2012-WSD, 2015 WL

1731604, at *3 (N.D. Ga. Apr. 14, 2015) ("The appropriate standard of proof to determine whether

[the defendant] murdered his wife, and is thus barred from receiving benefits under the Policy, is

a preponderance of the evidence.") (citing Adamo, 286 F. App'x at 627).  If a defendant is barred

from receiving the proceeds of an insurance policy under the Slayer Statute, then the proceeds go

to any "secondary beneficiaries . . . named in the policy" or, if none are named, then to "the other

heirs of the deceased who may be entitled thereto by the laws of descent and distribution of this

state."  O.C.G.A. § 33-25-13.

Under Georgia law, a person commits murder "when he unlawfully and with malice

aforethought, either express or implied, causes the death of another human being."  O.C.G.A. §

16-5-1(a).  "Malice can be either expressed or implied . . . ."  Taraszka v. Graziosi, No. 3:11-CV-

80 (CAR), 2013 WL 1680640, at *7 (M.D. Ga. Apr. 17, 2013) (citing O.C.G.A. § 16-5-1(b)).

14

"Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." O.C.G.A. § 16-5-1(b). "Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Id. Furthermore, under Georgia law, a person commits voluntary manslaughter when he "causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." O.C.G.A. § 16-5-2(a).

## II.      The Amodios' Motion for Summary Judgment

The Amodios argue that they are entitled to summary judgment because no genuine issues of material fact exist as to whether Defendant Riley committed murder or, at minimum, voluntary manslaughter in the killing of Lisa Riley. (Doc. 74-1, pp. 17–22.) According to the Amodios, even though Defendant Riley's motion for new trial remains pending in state court, the evidence— namely, the evidence presented against Defendant Riley at his criminal trial—establishes that Defendant Riley murdered Lisa Riley. (See id.) The Amodios further assert that Defendant Riley's invocation of the Fifth Amendment in response to discovery requests creates an inference against him. (Id. at pp. 20–22.) Defendant Riley responds that summary judgment is inappropriate because the Amodios rely on "circumstantial evidence" and generally the Court must make all reasonable inferences in his favor. (See doc. 79, pp. 4–11.) Defendant Riley further argues that his invocation of the Fifth Amendment does not create an inference against him because any inference against him contradicts the standard of review on summary judgment. (Id. at pp. 11–14.)

Here, the Amodios presented the trial transcript and trial exhibits from Defendant Riley's criminal trial in state court as evidence that Defendant Riley murdered Lisa Riley and is, thus, not permitted to recover any of the insurance proceeds. (See doc. 74-2.) However, based on the evidence the Amodios pointed out to the Court, the Court cannot conclude on summary judgment that Defendant Riley committed murder or voluntary manslaughter. Indeed, the evidence from Defendant Riley's criminal trial does not show what occurred in the Back Bedroom at the purported time of the shooting. For example, the Amodios rely, in part, on footage from Camera Three and the fact that the Back Bedroom's glass-break detectors were triggered in an attempt to show that Defendant Riley killed Lisa Riley on the evening of July 9, 2015. However, Camera Three's field of view does not include the interior of the Back Bedroom, the entrance to the Back Bedroom, or even the hallway where the Back Bedroom is located. (See Trial Ex. S-7.) At most, Camera Three establishes that Defendant Riley was in the same area of the house at the time the Amodios contend that Lisa Riley was shot and killed. Likewise, though ADT's log indicates that the Back Bedroom's glass-break indicators went off while Defendant Riley and Lisa Riley were both in the area of the Back Bedroom, the evidence does not establish that they were set off by gunshots, and—even assuming they were triggered by the gunshot that killed Lisa Riley—the evidence does not establish *who* fired the shot. Furthermore, while the Amodios rely on Dr. Sims-Stanley's testimony, the Amodios do not point to any testimony that conclusively points to Defendant Riley as the shooter. (See docs. 74-1, 87.) Rather, Dr. Sims-Stanley testified that the manner of Lisa Riley's death was "*best classified* as homicide." (Trial Tr. Vol. 7, p. 1239 (emphasis added).) Indeed, Dr. Sims-Stanley's testimony concerned reasons that "suggested [Lisa Riley's death] was *not likely* a suicide." (Id. at 1230 (emphasis added).) For example, concerning the trajectory of the gunshot wound, Dr. Sims-Stanley merely testified that Lisa Riley's wound did

not match the "*most common* trajectory for suicide gunshot wounds." (Id. at 1229 (emphasis added).) Likewise, concerning the "muzzle to victim distance," Dr. Sims-Stanley admitted that two to three percent of suicide gunshot wounds are "non-contact wounds" like the wound that Lisa Riley suffered. (Id. at pp. 1228–29, 1244.) Thus, viewing the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party (as the Court must do on summary judgment), see Peek-A-Boo Lounge of Bradenton, Inc., 630 F.3d at 1353, the Court finds that a question of material fact exists as to who shot Lisa Riley.

The Amodios further contend that the Court should make adverse inferences against Defendant Riley because Defendant Riley invoked his Fifth Amendment right against self-incrimination in response to interrogatories, document requests, and deposition questions. (Doc. 74-1, p. 21.) While the Amodios do not specify which of Defendant Riley's invocations of the Fifth Amendment they believe entitle them to any specific adverse inference(s), (see docs. 74-1, 87), they do state that they seek adverse inferences based on questions that "address issues of [Defendant Riley's] guilt," (doc. 74-1, p. 21).

"The Fifth Amendment privilege against compelled self-incrimination operates differently in criminal and civil contexts. The ordinary rule in a criminal case is that no negative inference from the accused's silence is permitted." Coquina Invs. v. TD Bank, N.A., 760 F.3d 1300, 1310 (11th Cir. 2014) (citing Griffin v. California, 380 U.S. 609, 615 (1965)). The "general rule" in civil cases, however, is that "the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them." United States v. Premises Located at Route 13, 946 F.2d 749, 756 (11th Cir. 1991); see, e.g., Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1304 (11th Cir. 2009) ("[I]n a civil suit . . ., the court may draw adverse inferences against a party that invokes the Fifth

Amendment."). When drawing adverse inferences against a party invoking his Fifth Amendment right, the Court may infer "that the answers to the questions would not have been favorable to the [individual] asserting the privilege." United States v. Two Parcels of Real Prop. Located in Russell Cnty., 92 F.3d 1123, 1129 (11th Cir. 1996); see, e.g., Hamilton Grp. Funding, Inc. v. Basel, 311 F. Supp. 3d 1307, 1316 (S.D. Fla. 2018) ("The Eleventh Circuit [Court of Appeals] has described the permissible response in cases such as that of the Defendant's invocation of his Fifth Amendment right, at his deposition and in response to discovery requests in the above-styled cause, as permitting the inference 'that the answers to the questions would not have been favorable to the [individual] asserting the privilege.'") (quoting Two Parcels of Real Prop. Located in Russell Cnty., 92 F.3d at 1129). However, the Eleventh Circuit has "recognized an exception to this general rule: the Fifth Amendment is violated when a person, who is a defendant in both a civil and criminal case, is forced to choose between waiving his privilege against self-incrimination or losing the civil case on summary judgment." Premises Located at Route 13, 946 F.2d at 756; see, e.g., S.E.C. v. Zimmerman, 854 F. Supp. 896, 899 (N.D. Ga. 1993) ("The Fifth Amendment is violated when a defendant, who is a defendant in both a criminal and civil case, is forced to choose between waiver of testimonial privilege and automatic entry of an adverse judgment in a civil case.") (citing Pervis v. State Farm Fire & Cas. Co., 901 F.2d 944, 946–49 (11th Cir. 1990); Premises Located at Route 13, 946 F.2d at 756). "[T]o trigger this [exception], the invocation of the privilege must result in an adverse judgment, not merely the loss of [the defendant's] most effective defense." Premises Located at Route 13, 946 F.2d at 756 (internal quotations omitted).

Given the present posture of the related criminal case, the Court declines to make any adverse inferences against Defendant Riley as doing so would be premature and could result in the "automatic entry of an adverse judgment" against Defendant Riley. Zimmerman, 854 F. Supp. at

899.    For example, Defendant Riley invoked his Fifth Amendment right in response to interrogatories asking Defendant Riley to "[d]escribe in detail each injury that Lisa Riley ever received during [their marriage], and [to] state [his] contention of how each injury and incident occurred." (Doc. 74-6, pp. 12–13.)  Defendant Riley also invoked his Fifth Amendment right in response to certain deposition questions, including questions asking if he shot Lisa Riley on July 9, 2015, intended to shoot Lisa Riley on July 9, 2015, intended to kill Lisa Riley on July 9, 2015, and whether Lisa Riley shot herself.  (Doc. 73, pp. 27–28.)  If the Court infers that "the answers to the[se] questions would not have been favorable to" Defendant Riley, Two Parcels of Real Property Located in Russell Cnty., 92 F.3d at 1129, then the Amodios would likely be entitled to summary judgment, meaning that Defendant Riley would face an "automatic entry of an adverse judgment" in this civil case, Zimmerman, 854 F. Supp. at 899.  Furthermore, Defendant Riley's own testimony is likely the only way for him to rebut the evidence presented against him as the record does not indicate that anyone witnessed the shooting of Lisa Riley.  See generally S.W. v. Clayton Cnty. Pub. Sch., 185 F. Supp. 3d 1366, 1373 (N.D. Ga. 2016) ("The Court is convinced that Arrington's defense in this case will substantially implicate his Fifth Amendment rights, and that Arrington stands to lose this case on summary judgment if he invokes that right.  Of paramount importance is the fact that many of the interactions between S.W. and Arrington occurred without other witnesses present.  Seemingly, Arrington's only avenue to refute S.W.'s testimony will be to testify in his own defense.  Otherwise, the Court will be left with unrefuted testimony from S.W., which would almost certainly lead to judgment against Arrington.").  This is especially significant since the evidence the Amodios have presented, such as the video surveillance and security system logs, do not depict the shooting or the interactions between Defendant Riley and Lisa Riley in the area of the Back Bedroom at the time the Amodios contend the shooting occurred.

Thus, the Court declines, at this time, to make any adverse inferences against Defendant Riley that could result in the "automatic entry" of summary judgment against him.

## CONCLUSION

In light of all the foregoing, the Court **GRANTS** Defendant Yathomas Riley's request to withdraw his admissions to the Amodios' Requests for Admission and **DENIES without prejudice** Defendants Joseph and Eileen Amodio's Motion for Summary Judgment.  (Doc. 74.) The Court also **DENIES** Defendants Joseph and Eileen Amodio's Motion for Hearing.  (Doc. 76.) The Court will schedule a status conference during which the parties and the Court will address whether this case should be stayed until Defendant Riley exhausts his right to a direct appeal of his criminal conviction or the time to file a direct appeal of his criminal conviction has expired.

**SO ORDERED**, this 21st day of March, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

20